UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FRANCISCO OLIVENCIA,           :
    Plaintiff,                 :
                               :
v.                             :       3:21-cv-739 (OAW)
                               :
MRS. PUN et al,                :
    Defendants.                :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    **THIS CAUSE** is before the court upon Defendants' Motion for Summary Judgment and memorandum in support thereof (together, "Motion"). *See* ECF Nos. 32 and 32-1. The court has reviewed the Motion, Defendants' Statement of Facts ("Defendants' SOF"), *see* ECF No. 32-2,[1] Plaintiff's opposition briefs, *see* ECF Nos. 40 and 45, Plaintiff's declaration and the declaration of Marcus Williams (a witness), *see* ECF Nos. 38 and 39, Plaintiff's responses to the Defendants' SOF, *see* ECF No. 41, Defendants' Reply in support of the Motion, *see* ECF No. 44, all other supporting exhibits, and the record in this matter and is thoroughly advised in the premises.

    After careful review, the Motion for Summary Judgment is **DENIED in part** and is **GRANTED in part.**

---

[1] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Defendants informed Plaintiff of this requirement in their Notice to *Pro Se* Litigant.  *See* ECF No. 32-7.  Thus, where Plaintiff has not filed a response to Defendants' Local Rule 56(a)1 Statement in compliance with Local Rule 56(a)2, the facts asserted in Defendants' SOF may be deemed admitted where supported by the evidence.  *See Small v. Clements*, No. 3:18-CV-1731 (KAD), 2019 WL 5727388, at *1, n.1 (D. Conn. Nov. 5, 2019); *Wu v. Nat'l Geospatial Intel. Agency*, No. 3:14CV1603 (DJS), 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017) (noting in the context of a pro se plaintiff's failure to submit a Local Rule 56(a)2 statement, that "pro se parties are not excused from abiding by the Federal Rules of Civil Procedure.") (quoting *Collins v. Experian Credit Reporting Service*, No. 3:04CV1905 (MRK), 2006 U.S. Dist. LEXIS 72020, at *3, 2006 WL 2850411 (D. Conn. Oct. 3, 2006)).

## I.      BACKGROUND

During the time relevant to this action, Plaintiff was a sentenced inmate housed at Bridgeport Correctional Center within the Connecticut Department of Correction ("DOC").   ECF No. 41 at ¶ 1.

### A.      December 1, 2020, Incident

On December 1, 2020, Plaintiff was assaulted by another inmate.   *Id.* at ¶ 2; ECF No. 1 at ¶¶ 4-5; ECF No. 38 at ¶ 3.   Defendant Pun was located in the officer's station approximately twelve feet from where the assault occurred.   ECF No. 41 at ¶ 3. She immediately alerted correctional staff to the assault via radio.[2]   *Id.*

According to Plaintiff, Defendant Pun watched the assault from the officer's station.   ECF No. 1 at ¶¶ 5–6.   Plaintiff alleges that an unknown officer (later identified as Defendant Cordero) "rushed" at Plaintiff, "picked him up off of his feet and violently slammed [him] onto the concrete floor, shattering/breaking his knee [and] causing grave and excruciating pain and suffering."   *Id.* at ¶¶ 7–10; *see also* ECF No. 38 at ¶ 3 ("I was … violently assaulted from behind by a prison guard who maliciously lifted me up from the ground and violently and sadistically slammed me upon the concrete ground."), ECF No. at 39 ¶ 3.

Defendants have submitted prison surveillance camera footage taken at the time of the incident.   *See* ECF No. 32-5 ("Corridor Video"); ECF No. 32-6 ("Dayroom

---

[2] Plaintiff's denial of this fact is not supported by specific evidence in compliance with Rule 56(a)3.   No other evidence in the record suggests a dispute as to this fact.

Video"); ECF No. 33 (Notice of Manual Filing).[3]   The Corridor Video shows an inmate lunge and attack another inmate (presumably Plaintiff) as he proceeded down the corridor.   Corridor Video at 55:03-55:08.   The two inmates disappear from view. Corridor Video at 55:08.   The Dayroom Video shows the inmates fighting and falling onto the floor with numerous correctional staff following and surrounding them. Dayroom Video at ¶ 55:08–55:14; ECF No. 32-2 at ¶¶ 4–6.   The Dayroom Video (which depicts the incident as seen through a window in the dayroom) permits a view of mostly the upper torso of the correctional officers; at times, this view of the officers is almost wholly obscured by inmates in the dayroom watching the action through the window. *Id.*   Thus, the Dayroom Video does not afford a clear view of what actions the correctional officers took after the two inmates fell on the floor.   Dayroom Video at 55:15–56:15.

From the Corridor Video footage, one inmate (presumably Plaintiff) can be seen being pulled by his arms by correctional staff.   Corridor Video at 55:12–55:15.   This inmate later stands with his face toward the corridor wall surrounded by correctional staff (at times, the inmate is not visible, and the video does not clearly depict the correctional officers' conduct while they surround the inmate).   *Id.* at 55:15–55:18. Correctional staff appear, however, to be handcuffing the inmate, who is not showing any resistance.   *Id.* at 55:18–55:48   The inmate appears to be standing on one foot

---

[3] Where the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, the court must view the facts "in the light depicted" by the video of the incident.  *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007).

while he is being handcuffed.   *Id.*   Correctional staff turn the inmate (who is handcuffed by this time) to walk down the corridor with his back to the camera, but it is not clear whether the inmate can walk on his own or is receiving assistance from the officers.   *Id.* at 55:48-55:58.   Both videos show numerous correctional officers, but none is identifiable as Defendant Cordero.   Neither video has sound and neither video features any view of the officer's station.

Defendant Cordero avers that he did <u>not</u> come into physical contact with Plaintiff, use any force against him, or observe any other correctional officer pick Plaintiff up and slam him on the floor.   ECF No. 32-4 at ¶¶ 8–9.   Cordero further avers that he assisted other correctional staff in securing the inmate who ambushed Plaintiff, and later escorted the other inmate involved in the altercation to the restrictive housing unit at Bridgeport Correctional Center.   *Id.* at ¶¶ 10–12; *see also id.* at p. 7 (Attachment A: Incident Report).

### B.      Exhaustion of Administrative Remedies[4]

### <u>Administrative Remedies Under Administrative Directive 9.6[5]</u>

Administrative Directive 9.6 states that the DOC shall "provide a means for

---

[4] Plaintiff has attached exhibits to his complaint and to his opposition to the motion for summary judgment that support his factual allegations with respect to exhaustion.   *See* ECF No. 1 at 19–29; ECF No. 40 at 15–28.   Therefore, the court properly may consider these allegations in this discussion.   *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that a verified pleading that contains "allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *Jordan v. LaFrance*, No. 3:18-CV-1541 (MPS), 2019 WL 5064692, at *1 n. 1 (D. Conn. Oct. 9, 2019) (noting that courts may review the allegations of a verified complaint in consideration of a motion for summary judgment).
[5] This discussion will reference the directive Defendants have submitted as an exhibit, which is the directive as it was at the time Plaintiff sought redress for the alleged violations. *See* ECF No. 32-3.   Since that time, the DOC has issued an updated Directive 9.6 effective April 30, 2021, which publicly is available on the DOC's website at https://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited Sept. 15, 2022).

an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority."  A.D. 9.6(1). Administrative Directive 9.6(6) provides the grievance procedure for "any issue relating to policy and procedure, and compliance with established provisions."   A.D. 9.6(1).   It requires an aggrieved inmate to first seek informal resolution prior to filing a grievance. A.D. 9.6(6)(A).   In the event that "the verbal option does not resolve the issue," it states that "the inmate shall submit a written request via CN 9601, Inmate Request Form."   *Id.* Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (form CN 9601) with the grievance (form CN 9602) or explain its absence.   A.D. 9.6(6)(C).   The grievance must be filed within thirty calendar days of the date of the events giving rise to the grievance and should include a copy of the response to the Inmate Request Form or explain why the response is not attached. *Id.*

The Unit Administrator then performs a Level 1 review of the grievance and responds to it in writing within thirty business days of receiving it.   *See* A.D. 9.6(6)(I).   A grievance may be rejected, denied, compromised, upheld, or withdrawn.   A.D. 9.6(6)(D).   When a grievance is returned without disposition, that means the "grievance has not been properly filed and may be re-filed after the inmate has corrected the error." A.D. 9.6(6)(E).   A grievance may be returned to an inmate without disposition if: (1) the inmate has not first attempted informal resolution; (2) the inmate fails to either attach the Inmate Request Form and the response thereto or adequately explain why the form is not attached; or (3) the inmate fails to adhere to the various requirements under Section

(5)(E)(1)–(5) of the directive.    A.D. 9.6(6)(E)(1)–(3).   When a grievance is returned without disposition, an inmate will receive a form CN 9606 (a "Grievance Returned Without Disposition" form).   *See* A.D. 9.6(6)(E).   A grievance returned without disposition due to a failure to comply with the procedural requirements of Administrative Directive 9.6 may not be appealed.   *See* A.D. 9.6(6)(G).   The inmate may otherwise appeal the Unit Administrator's disposition of the grievance, or the Unit Administrator's failure to dispose of the grievance in a timely manner.   A.D. 9.6(6)(G), (I) & (K).

The appeal receives a Level 2 review.   A.D. 9.6(6)(K).   An appeal for Level 2 review must be filed within five calendar days of the inmate's receipt of the result of the Level 1 review.   *See id.*   If the appeal is based upon the Unit Administrator's failure to complete the Level 1 review in a timely manner, the appeal must be filed within 65 days from the date the CN 9602 form was filed by the inmate.   *See* A.D. 9.6(6)(M).   Level 2 reviews are performed by the appropriate District Administrator.   A.D. 9.6(6)(K)(1). The District Administrator's Level 2 response must be completed within thirty business days of receipt of the appeal and must include a statement indicating the reasoning behind the Level 2 determination.   A.D. 9.6(6)(K).

A Level 2 determination may also be appealed for Level 3 review.   A.D. 9.6(6)(L).   Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, and appeals for Level 2 review to which the District Administrator has not issued a timely response.   *Id.*   An appeal for Level 3 review must be filed within five calendar days from the inmate's receipt of the determination of the Level 2 review.   *Id.*   An appeal of the District Administrator's failure to perform a Level 2

6

review in a timely manner must be filed within 35 days of the filing of the appeal for

Level 2 review.   A.D. 9.6(6)(M).   A Level 3 Appeal is reviewed by the Commissioner or

their designee.   A.D. 9.6(6)(L).

**Plaintiff's Grievance Filed Under Directive 9.6**

Plaintiff filed a grievance dated December 26, 2020, complaining about injury to

his right kneecap resulting from the use of excessive force in connection with the

incident on December 1, 2020.   *See* ECF No. 1 at ¶ 19 and pp. 19–21, 25–30; ECF No.

40 at 15–29.   On the grievance form, he checked the box on the section informing him

of the following: (1) that he had to attempt informal resolution prior to filing a grievance;

(2) that he had to either attach a copy of the Inmate Request Form with the response

thereto or state the reason why the form was not attached; and (3) that he had to file his

grievance within 30 days of the cause of the grievance.   ECF No. 1 at 19; ECF No. 40

at 15.   In his grievance, Plaintiff wrote: "No request form atta[]ched, no [in]formal

resolution . . ."   ECF No. 1 at 20; ECF No. 40 at 16.

A Grievance Returned Without Disposition form (CN 9606) dated January 14,

2021, informed Plaintiff that his grievance was returned because he did not "attempt to

resolve the issue informally by utilizing the Inmate Request Form system and the Chain

of Command before submitting an Administrative Remedy Form."   ECF No. 1 at 21;

ECF No. 40 at 19.   The CN 9606 explained that an "inmate shall attach CN 9601,

Inmate Request Form, containing the employee's response, or explain why it is not

attached . . . ."   ECF No. 1 at 21; ECF No. 40 at 19.   The end of the form stated that

7

Plaintiff could "resubmit [his] grievance when it is in compliance with Administrative Directive 9.6, Inmate Administrative Remedies."   ECF No. 1 at 21; ECF No. 40 at 19.

Plaintiff subsequently filed another grievance dated February 2, 2021, that complained about his knee being broken as a result of excessive force used in connection with the incident on December 1, 2020.   *See* ECF No. 1 at 25–26; ECF No. 40 at 17–18.   In Section 4 of this grievance, he wrote: "No [in]formal resolution Request form atta[]ched w/no respon[s]e."   ECF No. 1 at 26; ECF No. 40 at 18.   This grievance was rejected on March 4, 2021, because it was not filed within 30 days of the date of the incident.   ECF No. 1 at 26; ECF No. 40 at 19.

Plaintiff appealed for Level 2 review on March 24, 2021.   *See* ECF No. 1 at 29; ECF No. 40 at 25.   On May 3, 2021, Plaintiff's appeal was rejected because his February 20, 2021, grievance was untimely.   ECF No. 1 at 29; ECF No. 40 at 25.

## **Complaint**

On May 28, 2021, Plaintiff filed his complaint in this action.   *See* ECG No. 1. Following an initial review pursuant to 28 U.S.C. §1915A, the court permitted Plaintiff to proceed under section 1983 for damages based on (1) Eighth Amendment excessive force claims against Defendant Cordero and Defendant Pun (for their failure to intervene), and (2) an Eighth Amendment failure to protect claim against Defendant Pun.   *See* ECF No. 10 at 4–8.

## II.   STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of proving that no genuine factual disputes exist.   *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).   "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."   *Id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see also Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   "At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."   *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004).   Put another way, "'[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party,' summary judgment must be denied."   *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002)).

A party who opposes summary judgment "cannot defeat the motion by relying on

9

the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."   *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996).   Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.   *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

### III.    DISCUSSION

Defendants argue (1) that Plaintiff failed to exhaust his administrative remedies in compliance with the Prison Litigation Reform Act ("PLRA"), (2) that Plaintiff cannot establish his Eighth Amendment claims against Defendants, and (3) that qualified immunity shields Defendants from liability.   ECF No. 32-1.   Plaintiff asserts that he has satisfied the exhaustion requirement because administrative remedies were unavailable.   ECF No. 1 at ¶¶ 19–42; ECF No. 38 at ¶ 5; ECF No. 40 at 3–5.

The court first addresses Defendants' argument that Plaintiff failed to exhaust his administrative remedies under Administrative Directive 9.6 prior to filing this action.

### A.    Exhaustion of Administrative Remedies

The PLRA, which governs actions brought by prison inmates, requires a prisoner to exhaust administrative remedies prior to filing a federal lawsuit regarding prison conditions.   42 US.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").   Failure to exhaust is an affirmative defense under the PLRA.   *See Jones v. Bock*, 549 U.S. 199, 216 (2007).[6]   A defendant bears the burden of showing that an inmate did not exhaust his or her remedies prior to filing the action in court.   *See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment.").

Section 1997e(a) applies to all claims regarding prison life.   *See Porter v. Nussle*, 534 U.S. 516, 532 (2002).   The statute requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).   A claim is not exhausted until the inmate complies with all administrative deadlines and procedures.   *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).   Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement.   *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).   If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court.   *See Woodford*, 548 U.S. at 95.   Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements."   *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83–84).

The exhaustion requirement, however, by the statute's own language, only applies to *available* remedies.   *See Ross v. Blake*, 578 U.S. 632, 642 (2016).   Thus,

---

[6] Defendants have asserted failure to exhaust as an affirmative defense.   ECF No. 15 at 3.

"an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"   *Id.*, 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).   The Supreme Court of the United States has established three circumstances under which an administrative procedure is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."   *Id.* at 643–44.   "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."   *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

It is not sufficient for a plaintiff to exhaust his administrative remedies after filing his complaint; a plaintiff must exhaust his administrative remedies prior to filing the action in federal court.   *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds*; *Porter*, 534 U.S. 516; *Gulley v. Bujnicki*, No. 3:19-CV-903 (SRU), 2019 WL 2603536, at *3 (D. Conn. June 25, 2019).   The Supreme Court has explained:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).

*Woodford*, 548 U.S. at 90 (citation and internal quotation marks omitted).

Thus, Plaintiff was obligated to exhaust his administrative remedies under Administrative Directive 9.6 for the claims alleged here prior to filing this action.   *See Riles v. Buchanan*, 656 F. App'x 577, 581–82 (2d Cir. 2016) (affirming district court's dismissal based on inmate's failure to exhaust his administrative remedies under Administrative Directive 9.6).   "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."   *Bock*, 549 U.S. at 218.

Although a defendant bears the burden on this affirmative defense at all times, the plaintiff may still have to adduce evidence in order to defeat a motion for summary judgment.   *See Hudson v. Kirkey*, No. 920CV0581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once a defendant introduces evidence of a functional grievance system, plaintiff could not defeat summary judgment without submitting competent evidence to indicate unavailability).

Under Directive 9.6(6)(C), Plaintiff had until December 31, 2020, to file his grievance.[7]   Plaintiff's first grievance, filed on December 26, 2020, was filed within the 30-day period, but it failed to satisfy the requirement that he show an attempt to reach an informal resolution prior to filing the grievance, as the directive requires.   Plaintiff's own grievance form acknowledged his failure to comply with sections (A) and (C) of

---

[7] Decisions from this district have calculated the 30-day period under Administrative Directive 9.6 by excluding the date of the incident.   *See Sease v. Frenis*, No. 3:17-CV-770 (SRU), 2021 WL 260398, at *4 n.3 (noting that Federal Rule of Civil Procedure Fed. R. Civ. P. 6(a)(1)(A) provides when a "statute ... does not specify a method of computing time" and the "period is stated in days," one computing the time should "exclude the day of the event that triggers the period.").

Directive 9.6 by failing to seek such informal resolution (before filing the grievance) and by failing either to attach the CN 9601 (Inmate Request Form) or to explain its omission. This court previously has determined that an inmate-plaintiff who is aware of the grievance procedure but who fails to file a proper and timely grievance does not satisfy the PLRA exhaustion requirement.   *See Davis v. Williams*, No. 3:16-CV-01981 (JAM), 2019 WL 1012008, at *3 (D. Conn. Mar. 4, 2019) ("What is clear from the record is that [the plaintiff] did not file any proper Level 1 grievance within 30 days of the incident on August 18, 2016, that gave rise to his grievance.   The first grievance that he filed on August 18, 2016, was indeed timely but manifestly deficient for failure to exhaust the informal resolution process.   [The plaintiff] clearly knew that. The second grievance that he filed on September 27, 2016, was well more than 30 days after August 18, 2016. [The plaintiff] clearly knew that as well.").

But this court has more recently denied a motion for summary judgment that argued that a plaintiff had failed to exhaust his administrative remedies by filing a grievance beyond the thirty-day window after his grievance had been returned without disposition.   *See Sease v. Frenis*, No. 3:17-CV-770 (SRU), 2021 WL 260398, at *7 (D. Conn. Jan. 25, 2021).   In rejecting the defendant's position, the district court noted that an inmate could have "virtually (or literally) no opportunity to re-file a corrected Level 1 grievance" within the thirty-day window after a grievance is returned without disposition. *Id.* at *8.   The district court observed that requiring an inmate to re-file a corrected grievance within the 30-day period after return without disposition would contradict the administrative provision of Directive 9.6(6)(E) to "refile[] after the inmate has corrected

the error[,]" and that such approach would render Directive 9.6 "so opaque that it is unavailable."  *Id.*

Here, Plaintiff's Level 1 grievance was returned without disposition, with the CN 9606 form, on January 14, 2021, after the 30-day period had expired.   ECF No. 40 at 19.   Both Directive 9.6(6)(E) and the CN 9606 form permit an inmate to re-file a returned grievance after the inmate corrects any defect.   *See Sease*, 2021 WL 260398, at *9.   As Plaintiff points out, neither Directive 9.6(6)(E) nor CN 9606 provides a time limit for the inmate to correct the error and resubmit the grievance.[8]   ECF No. 1 at ¶ 26; *see* ECF 32-3.   Thus, it is not clear why Plaintiff's re-filed Level 1 grievance, dated February 20, 2021—which explained that his attached grievance received no response—should have been rejected as untimely; any re-filed grievance necessarily would have been untimely.   Although Plaintiff could have taken a timely appeal of this Level 1 rejection, the administrative scheme under Administrative Directive 9.6 failed to provide guidance on when he could resubmit his grievance after return without disposition.   Where an administrative scheme makes it impossible for an inmate to know whether and how to pursue his grievance, the administrative remedy may be considered to be unavailable because it is "so opaque" and "confusing that … no reasonable prisoner can use [it]."   *Williams v. Correction Officer Priatno*, 829 F.3d 118, 125 (2d Cir. 2016) (citing *Ross*, 578 U.S. at 643-644) (first alteration in original, second alteration added); *see also Sease*, 2021 WL 260398, at *9 ("If the absence of guidance

---

[8] Of note, the revised Directive 9.6 (which is effective April 30, 2021) provides a time limit of five calendar days to correct and resubmit a grievance rejected for a procedural defect.   A.D. 9.6(6)(b)(2), available at https://portal.ct.gov/DOC/AD/AD-Chapter-9.

in a grievance procedure can lead to an administrative scheme's being 'prohibitively opaque,' then surely contradictory instructions in a grievance procedure can also lead to an administrative scheme's being prohibitively opaque.") (citing *Priatno*, 829 F.3d at 124–27) (internal citation omitted).

Thus, construing the relevant evidence most favorably to Plaintiff, the court concludes that Plaintiff's administrative remedies were unavailable as "prohibitively opaque" and therefore should be considered exhausted.   *See Sease*, 2021 WL 260398, at *9.   Accordingly, the court rejects Defendants' argument for summary judgment on the basis of nonexhaustion.

### B.    Merits of the Eighth Amendment Claims

Defendants maintain that no reasonable juror could find either that Defendants Cordero and Pun violated Plaintiff's Eighth Amendment rights by using excessive force against him or that Defendant Pun violated Plaintiff's Eighth Amendment rights by failing to protect him from the inmate attack on December 1, 2020.

### 1.    Eighth Amendment Excessive Force

The Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An inmate alleging excessive force in violation of the Eighth Amendment has the burden of establishing both an objective and a subjective component.   *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the inmate must show that the defendant's conduct was serious enough to have violated "contemporary standards of decency."

*Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103

1976)).   A de minimis use of force will rarely be sufficient to satisfy the objective

component unless that force is also "repugnant to the conscience of mankind."   *Wilkins*

*v. Gaddy*, 559 U.S. 34, 38 (2010) (quoting *Hudson v. McMillian*, 503 U.S. at 9–10).

However, it is the force used, not the injury sustained, that "ultimately counts."   *Id.*

"When prison officials maliciously and sadistically use force to cause harm,

contemporary standards of decency always are violated."   *Hudson v. McMillian*, 503 at

9.   The inmate need not have suffered a significant injury as a result of the defendant's

conduct to satisfy the objective component.   *See Wilkins*, 559 U.S. at 37 (2010).

The subjective component requires the inmate to show that prison officials acted

wantonly and focuses on "whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm."   *Hudson v. McMillian*,

503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).   The court

considers factors including "the need for application of force, the relationship between

that need and the amount of force used, the threat reasonably perceived by the

responsible officials, and any efforts made to temper the severity of a forceful

response."   *Id.* (internal quotations and citation omitted).

a.   **Defendant Cordero**

In his declaration, Plaintiff avers that a prison guard (whom he has identified as

Defendant Cordero) "lifted" him up and "slammed" him to the ground after he was

assaulted by the other inmate on December 1, 2020.   ECF No. 38 at ¶ 4; *see* ECF No.

22 (identifying Doe defendant as Defendant Cordero).   Plaintiff has also submitted a

declaration from another inmate, Marcus Williams, who avers that he witnessed

Plaintiff's assault on December 1, 2020, and that an "unidentified prison guard came up

behind [Plaintiff] and violently threw him to the ground without any justification for using

force upon [Plaintiff]."   ECF No. 39 at ¶ 3.   Defendant Cordero avers that he did not

come into physical contact with Plaintiff or employ any force against him.   ECF No. 32-

4 at ¶ 8.    As is often the case with video footage inside a prison, the surveillance

footage submitted in this case does not present a clear depiction of the events relevant

to Plaintiff's claims of excessive force.   During the Corridor Video, the two inmates

involved in the physical assault disappear from view immediately after the assault.

Corridor Video at 55:05-55:08.   The Dayroom Video fails to provide a clear view of the

interaction between the responding officers and the two inmates, and the view of the

correctional officers' response is at times obscured by inmates standing to watch the

incident through the dayroom window.   Dayroom Video at 55:12-55:36.   Further, the

court cannot determine from either video the identities of the correctional officers or

what specific action the officers took to separate the two inmates.   Corridor Video at

55:05-55:14; Dayroom Video at 55:12-55:36.   However, the video from the two vantage

points is sufficient for the court to offer the following detail.

Just before the altercation, about ten to fifteen correction officers are positioned

along the walls of the corridor.   At about 55:03, someone (presumably the plaintiff)

enters the corridor and, two seconds later (at 55:05), an aggressor attacks him without

provocation, while the two inmates are just beyond arm's length from the closest officer.

The correction officers respond immediately (without even a moment's hesitation) and

separate the two prisoners within a matter of seconds.   While the altercation

progressed off screen[9] soon after it began, the inmate whom the court presumes to be

the plaintiff was pulled back into view by several officers a mere five seconds later (at

about 55:13), with Plaintiff still facing the direction of the altercation.

They dayroom video shows a door with its top half apparently made of glass,

along a wall of glass panels.   Looking through that glass wall, it appears that the

dayroom is at the start of a hallway just off the corridor where the altercation began.

Around 55:08, the altercation is visible in the hallway near the corridor.   It quickly

moves into the hallway outside the dayroom door, and the altercation progresses to the

ground within three seconds.   Immediately thereafter, the group of correction officers

intervene and separate the parties.   By 56:00, the entire incident appears to be over.

The inmates who were in the dayroom moved toward the altercation shortly after it

progressed to the ground, somewhat limiting visibility of that portion of the incident, but

it is clear that the officers who responded to the attack were very close to one another,

and that they separated the parties extremely quickly.

The court acknowledges that correction officers often have to act quickly and

decisively in resolving prison altercations before serious injury occurs, and before

additional inmates have the opportunity to join in the violence (or to prevent officers

from gaining control of the situation).   Still, it is possible for such officer response to be

immediately malicious, sadistic, or excessive in nature.   In the present case, it certainly

does not appear as though any officer responds with any wanton or gratuitous violence

---

[9] The two inmates exit the view of the corridor video at about 55:08.

in so quickly and effectively separating the parties.   Nevertheless, the court must admit

that the video is not of high enough quality to clearly discern the individuals, their

positioning, and their actions, so the court hesitates to stand in the place of the jury in

determining whether even a quick and decisive act was excessive in this situation; it

cannot render a credibility assessment on a motion for summary judgment.   *Fischl v.

Armitage*, 128 F.3d 50, 55 (2d Cir. 2017) ("Credibility assessments, choices between

conflicting versions of the events, and the weighing of evidence are matters for the jury,

not for the court on a motion for summary judgment.").   Because the record, including

the video evidence, fails to establish as a matter of law that Defendant Cordero did not

apply excessive force, the court must deny summary judgment on Plaintiff's claim of

excessive force against Defendant Cordero.   The court will leave Plaintiff to his proof.

  **b.**  **Defendant Pun**

  Officers are liable not only when they use excessive force themselves, but also

when they fail to intervene to stop the excessive use of force by another officer when they

are in a position to observe the conduct and have time to intervene.   *See Sloley v.

VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019).   "Liability attaches on the theory that the

officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality."   *Figueroa v.

Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11–

12 (2d Cir. 1988)).

  Plaintiff adduces no support for, and the record fails to show, any suggestion that

Defendant Pun was in a position to observe the correctional officers' response to the

assault or that she had an opportunity to intervene in that response.   *See* Corridor

Video at 55:05-55:14; Dayroom Video at 55:08-55:36; *see also Sloley*, 945 F.3d at 46-
47.   Even if Officer Pun had been in the immediate vicinity of the altercation, and even
if some single, instantaneous act of another officer possibly was excessive (however
remote the possibility in this case), it would be entirely unreasonable for any jury to
determine that Officer Pun could have stepped in to prevent such force in this case.

Neither the corridor nor the dayroom video appears to show Officer Pun, but the
correction officers who were near the altercation when it began were undeniably quick
to address the situation with almost instantaneous effectiveness.   While the court has
denied summary judgment as to Officer Cordero only in acknowledging the possibility
(however remote in this case) that decisive yet excessive action possibly can take place
in a brief moment, the court also hereby emphasizes just how quickly the officers
regained peace and prevented additional harm to Plaintiff at the hands of his attacker.
The court also emphasizes that the officers separated the inmates very quickly, so the
present case easily and entirely is distinguishable from incidents wherein an officer is
accused of standing by during a more lengthy officer-involved struggle or altercation.

If any excessive conduct took place at all (and the court once again notes that
the opportunity would have been slight, and the act instantaneous), no jury reasonably
would be able to find that Officer Pun failed to intervene under these circumstances.
For that reason, summary judgment is granted as to Defendant Pun.

### 2.   Eighth Amendment Failure to Protect

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands
of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes*–

*Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (CA1) (first alteration added, second alteration in original).   However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety."   *Id.* at 834.   A claim that a correctional officer failed to protect an inmate from attack rises to the level of a constitutional violation only when the officer acted with "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Id.* at 828.

The Corridor Video clearly shows that the inmate standing in the corridor made a sudden assault on the inmate presumed to be Plaintiff as he walked down the hall. Corridor Video at 55:05.   Plaintiff has adduced no evidence suggesting that Defendant Pun had any awareness that Plaintiff would be assaulted by another inmate on December 1, 2020, or that she could have taken steps to protect him from that assault.

Upon review of the present record, no reasonable juror could conclude that Defendant Pun acted with deliberate indifference by failing to protect Plaintiff from an inmate assault on December 1, 2020.   Accordingly, the court must grant summary judgment in Defendant Pun's favor on this claim as well.

## C.   Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—

even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"   *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson*, 555 U.S. at 231).   The court has discretion to determine the order in which it will address the inquiries required when assessing the applicability of qualified immunity.   *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010)).

A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.'"   *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate."   *Id.*

In addition, qualified immunity protects government actors when it was objectively reasonable for the government actor to believe that his conduct did not violate a clearly established right.   *Manganiello v. City of New York,* 612 F. 3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct

was unlawful – then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the question this court first asks is whether it was objectively reasonable for either of the defendants to believe their conduct was not unlawful at the time. *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015).

### 1. Defendant Cordero

Because the qualified immunity analysis turns on the facts surrounding whether Defendant Cordero was involved in a misuse of force during the response to the assault, and because the court has already found that those factual questions are genuinely in dispute, the court cannot conclude that Defendant Cordero is shielded by qualified immunity.   Thus, the qualified immunity argument must be rejected with respect to the Eighth Amendment excessive force claim against Defendant Cordero.

### 2. Defendant Pun

As the record evidence shows no indication that Defendant Pun could have had the opportunity to intervene to prevent the excessive force allegedly applied to Plaintiff, or to protect Plaintiff from the inmate assault on December 1, 2020, Defendant Pun is entitled to qualified immunity from liability; it was objectively reasonable for her to believe that she acted reasonably by alerting correctional staff about the Plaintiff's assault.   Accordingly, the court grants the Motion in Defendant Pun's favor on the alternative ground of qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, it is thereupon **ORDERED AND ADJUDGED** as follows:

1.      Defendants' Motion for Summary Judgment is **GRANTED in part.**

    a.  The motion is **DENIED** as to the Eighth Amendment excessive force claim against Defendant Cordero.

    b.  The motion is **GRANTED** as to the Eighth Amendment claims against Defendant Pun.   Defendant Pun hereby is dismissed from this action.

2**.**     Pursuant to Local Rule 83.10, the court concludes that appointment of counsel will serve the interests of justice. Therefore, the court respectfully asks the Clerk of Court to assign a pro bono attorney to represent Plaintiff in this action.

_____/s/_____
Omar A. Williams
United States District Judge

SO ORDERED at Hartford, Connecticut this 19th day of September, 2022.